Will the clerk please call the first case? 121-1326-WC Ezekiel Aracheta, appellant by Frank Kress v. Illinois Workers' Compensation Comm'n, City of Chicago, Appalachia, by Christopher Jarko. Mr. Kress, you may proceed. Good morning, your honors. Frank Kress on behalf of the appellants, Ezekiel Aracheta. So this is our second journey before your honors regarding this matter. Initially, the case was lost, the earlier filing at arbitration, and the commission upheld that decision due to lack of clarity regarding the claimant's injury, the records surrounding the claimant had established that he met his burden of proof regarding proving an accident that arose from his employment. On remand, the commission issued a decision which awarded the plaintiff permanent partial disability benefits equal to 15% loss to the person as a whole as a result of a shoulder injury that he sustained to his left shoulder and 20% loss to his right leg, both of those involved surgical intervention. The plaintiff also had back injuries that arose out of that accident, but I would venture to say those were minor in nature compared to the surgeries that he went through for the shoulder and the knee. Now following the surgeries to the shoulder and the knee, the plaintiff again underwent surgical intervention, but specifically with regard to his left shoulder, had a surgical intervention and then ended up having permanent restrictions imposed by an independent medical examiner named Dr. Kevin Tu. Now this was following work conditioning that was happening as a result of the shoulder injury. On September 1st of 2010, Dr. Tu examined the plaintiff and opined that he had permanent restrictions that included 40 pound floor-to-waist, 22 pounds overhead, and a push-pull of 27 pounds. The plaintiff worked as a tree trimmer for the defendant in a job that has been described in the record as very heavy duty, requiring the lifting of 100 pounds. So he wasn't... I think we're pretty familiar with the history, but let me ask you a question. I believe you're arguing here that the commission erred in declining to award your client a wage differential benefits under the act instead of the permanent partial disability. Is that correct? That is absolutely correct. Okay, so you might want to focus in on that. Absolutely. I wanted to get to the permanent restrictions and where that started because as we know from Section 8D1 of the Workers' Compensation Act, you have to show that a petitioner is partially incapacitated from pursuing his usual and customary employment. And his usual and customary employment requires him to lift 100 pounds as a tree trimmer. And the permanent restrictions imposed by Dr. Tu in September of 2010 were that he could only lift 40 pounds. The commission wasn't impressed by Dr. Tu suggesting that someone had a surgically repaired shoulder would end up having permanent lifting restrictions. The commission pointed to treating physician Dr. Gregory Nicholson who in February of 2009 indicated that he thought the plaintiff would be able to return to full duty work by March 19th of 2009. However, on March 18th of 2009, Dr. Nicholson examined the plaintiff and indicated that the plan was to perform a functional capacity evaluation so that permanent restrictions could be imposed with regard to the surgically operated left shoulder. Can I just interject a question? Wasn't the commission's decision on the issue not to award the claimant wage differential benefits was based on the finding that the claimant failed to establish a causal connection between the September 14th, 2007 work accident and the condition of ill-being in the claimant's knee, shoulder, cervical spine, and lumbar spine after the November 23rd, 2012 work accident? Didn't they find there was no causal connection there? The November 23rd, 2012 incident, I didn't read their decision to say that that severed the causal connection. I read their decision to say that there are no permanent restrictions. No permanent restrictions between the shoulder accident of September 14th of 2007 and the plaintiff's current state of ill-being as of the time that it wrote its decision in August of 2019. So did you read the decision that they found there was a causal connection between the September 14th, 2007 accident? Well, they awarded impermanent partial disability benefits at 15% loss to the person as a whole. So I read that to say they found a causal connection to the condition itself, but that the permanent restrictions, it found that there were no permanent restrictions. I hope that answers. Well, I'm not sure that that's what they found. I think they didn't find a causal connection there. So, I mean, you can read it any way you want, but the question is how the commission read it and how we ultimately read it. Yes. What do you make of this delay? There was a lot of discussion, as you know, as counsel for the claimant, that there was a great deal of delay between the September 14th, 2007 work accident when the claimant didn't seek any treatment for a cervical condition until almost three years later. And then with regard to the defendant's cervical condition, there was a long delay there. How does that help your case? Doesn't that hurt your case? I believe that if we were seeking compensation based upon the theory that the spinal injuries were what drove the permanent restrictions and the inability to return to work as a tree trimmer, that would be very relevant. I think that the commission spends great discussion in its decision sort of castings out over what is related and what isn't. And I would concur that at the end of the day, it appears as though the spinal injuries certainly could be argued were degenerative in nature and not. And yes, there were delays in treatment with regard to the cervical spine, the lumbar spine. But what really drove the restrictions and again, the restrictions that I believe are permanent and what Dr. Tu believes to be permanent was the shoulder condition for which there was no delay. Did they accept Dr. Tu's analysis, his opinion? Did the commission accept that? They did not. They did not. They indicated that they didn't believe Dr. Tu's opinions. And in stating so, it said that the commission wrote that the plaintiff had already returned to work months prior with the same title and earning the same wages, albeit with some accommodations. But that some accommodations is the language in that sentence that is vital. Never, ever, ever did this plaintiff return to full duty work, again, lifting 100 pounds in order to be a tree trimmer that would alleviate the defendant of the obligations of Section 8D1, which again, call for partial incapacity from pursuing usual and customary employment and evidence of diminution of wages. Well, the commission doesn't have to believe Dr. Tu, then? It does not have to believe Dr. Tu, but Dr. Nicholson is the other shoulder surgeon that examined the petitioner, the plaintiff, excuse me, and indicated that permanent restrictions would be in order following a functional capacity evaluation. Now, this of course, was in March of 2019 and no functional capacity evaluation happened until after the intervening accident on November 23rd of 2012. The functional capacity evaluation did not happen until July of 2014, but even in that functional capacity evaluation, the plaintiff was placed at medium duty level. So again, we've got objective evidence of an inability to lift 100 pounds and we've got orthopedic surgeons, Dr. Tu, orthopedic surgeons saying that that condition is permanent in nature and it was ignored. And my suggestion to you is it was ignored in a way that was again, counter to the manifest weight of the evidence in that there's zero elements of objective evidence to show that the plaintiff is able to lift 100 pounds to return to a very heavy duty job. And past that, the objective evidence of what the labor market is bears out that he was only able to earn $10 and 50 cents after a diligent job search. And I rely heavily in my brief on Jackson Park Hospital, which talks about post-injury earnings and earning capacity, not being synonymous. And this plaintiff was accommodated for 29 months, over two years. But I would suggest to you that your guidance from Jackson Park Hospital is that he was accommodated in a way that his wages were inflated and the actual labor market bore out that he was employable at $10 and 50 cents per hour. So that even if it was still being accommodated today, even if, excuse me, the defendant was still accommodating the plaintiff today, the labor market would be inflated to the point that a Section 8D1 award would still be in order. And I believe that to be the guidance from Jackson Park Hospital that again, post-injury earnings are not synonymous with earning capacity. And we have satisfied both prongs of Section 8D1 in that these permanent lifting restrictions from the standpoint of the shoulder only, for which there was not a gap in treatment, led to an inability to return to the usual and customary employment, which led to a diminution of earning capacity, which was borne out with a diligent job job search that ended in the plaintiff accepting a position as a security guard. The defendant was quite clear that it was no longer accommodating restrictions as of December 7th of 2012. And defendant's expert, Dr. Jay Levin, in August of 2014, who examined the plaintiff with regard to his spinal injuries, specifically wrote, restrictions relate to the accident in 2007. So everything is pointing at restrictions that are permanent in nature from the shoulder injury sustained September 14th of 2007. And the commission ignored it. And I think that the objective evidence is on the plaintiff's side, so much so that the opposite conclusion is clearly the correct one. And if we ignore the objective evidence, we can get to the decision that the commission came to. But if we observe it and recognize it, the objective evidence is on the plaintiff's side that the commission erred in a way that this decision should be reversed as it is counter to the manifest way of the evidence. Have you concluded Mr. Chris? I have. Thank you. Okay, you'll have time in reply. Thank you. Thank you, Mr. Jarkow. It please the court. Good morning, your honors. Good morning, counsel. Christopher Jarkow on behalf of the defendant of FLE city of Chicago. Your honors, I'm here today to request that you commission as its decision is neither contrary to law nor against the manifest way of the evidence. I ask that you affirm the decision in its entirety. Addressing the issue regarding the wage differential, the two elements that must be established are that the claimant must have suffered an injury that prevents him from returning to work in a suitable and customary employment. And second, he must establish that he sustained an impairment in his earning capacity. And we would propose that Mr. Erichetta established neither of those. Now, Mr. Erichetta sustained a number of injuries as a result of his September 2007 date of accident. Some physicians placed him on permanent work restrictions, some did not. And the commission was free to review the totality of the evidence to reject the permanent work restrictions for each body part. So you're saying the commission didn't ignore the contrary evidence relative to what he is alleging are permanent restrictions resulting from the injury to the shoulder back in 2007. You're saying they considered his evidence, his experts and rejected it. Is that essentially what you're saying? I think that's correct, your honor. In fact, the commission spends 12 whole pages going through each doctor. And I think they did a really good job outlining the medical that Mr. Erichetta underwent for the last decade and a half in order to get to their conclusion. And regarding the right knee, they adopted the opinion of Dr. Rob, who found that as of April of 2009, Mr. Erichetta was at maximum medical improvement and full duty. Dr. Madday was a treater and he didn't assess any permanent work restrictions. And the commission specifically commented on the opinions of Dr. Garopardi from for a number of reasons, primarily because his opinions came nearly three years later. And the fact that Dr. Garopardi didn't even review any medical records in reaching his opinion. Now to address the left shoulder problem that council spent a significant amount of time on, Dr. Nicholson was a treater with respect to the left shoulder. Dr. Nicholson found in February of 2009 that Mr. Erichetta was doing pretty well and recommended that he returned to work in full duty after a few weeks of work conditioning. It wasn't until March of 2009 when Mr. Erichetta returned to Dr. Nicholson and indicated that he had a flare up when Dr. Nicholson then recommended a functional capacity evaluation. The commission looked at the fact that this was doing well with in February of 2009, finding that he had full strength or excuse me, he had five out of five strengths and full range of motion. They found that the fact that he was doing well in February of 09 and he didn't have this flare up until a month later after it was apparent that he was going to be returning to work. The commission looked at that and they essentially said, we don't believe Mr. Erichetta. We think he can return to work. And the fact that Dr. Nicholson and Dr. Tube both recommended a functional capacity evaluation in March of 09 and then again in September of 10. And the fact that he didn't, Mr. Erichetta didn't have that FCE until four years later, I think gives credibility to the commission's decision and a basis for their reasoning. The commission also addressed the IME of Dr. Visotsky also from work restrictions and also didn't review any medical records. So based on that, the commission was able to look at the medical records as a whole. And they essentially found that they didn't think that the work restrictions were credible and that the claimants intention to return to work was credible. Finally, when the claimant returned to Dr. Nicholson in 2015, Dr. Nicholson found that the shoulder was doing very well. So the fact that years after the fact that the shoulder appears to have recovered shows that work restrictions for the shoulder were not appropriate. The commission was free to rely on those facts. It addressed the lumbar and cervical problems as well. The commission again found the fact that, well, there are a number of reasons why the commission didn't find that the lumbar and 2007 work injury. Specifically, the commission found four main reasons why the lumbar condition wasn't related. First, they found that Mr. Iracheta presented with low back pain in June 2009, three years before this work accident, despite the fact that he told his treaters and Dr. Lazar that he had no prior low back problems. Furthermore, Mr. Iracheta described inconsistent mechanisms of injury to Dr. Lazar and Fullerton Occupational Clinic. When petitioner treated with Dr. Hickbottom, he reported that his low back was injured while climbing in and out of a truck in February of 2013. Now, again, that's inconsistent with a tree falling on him in 2007. And finally, the fact that there were no complaints of low back pain until April of 2009, nearly two years later, give the commission even more reason to question the causation of the lumbar problems. Those can all be said as well for the cervical issues. Dr. Bernstein evaluated Mr. Iracheta in June of 2013 and found that the MRI findings were all benign. Again, there was another MRI in May of 2014 where Bernstein found that all the cervical problems were degenerative. And again, that was all seven years later. So the commission spent a significant amount of time going through the medical, analyzing the various expert opinions and took the facts as a whole and found that they didn't believe that Mr. Iracheta required work restrictions and found that he could go back to work. As such, I would ask that this be considered a decision as the commission's decision was not against manifest weight. Okay, thank you. Thank you, Mr. John Kyle. Mr. Kress, you may reply. Thank you. So again, we're sort of getting into the weeds about the spinal injuries and there being doubt about what's related and what's not. And that's sort of why I tried to focus on the shoulder. The shoulder is in the plaintiff's shoulder. There was work conditioning notes that were examined by Dr. Two, who was defendant's expert. And based upon the objective or conditioning notes, Dr. Two was able to prescribe permanent shoulder restrictions. If I may interject the question, opposing counsel seem to be alluding to the fact that the claimant's own treating physician had cleared him to go back to work. Is that correct? If it's the reference to Dr. Nicholson's February 2019 appointment. 2009, you mean? 2009, excuse me. In February, he indicated that the plaintiff was on track for a full duty return to work. But then one month later, one month later when he was seen, the plaintiff wasn't in the position to return to full duty, heavy duty work. And Dr. Nicholson prescribed a functional capacity evaluation and in that note wrote that there would be permanent restrictions imposed. So between February of 09 and March of 09, Dr. Nicholson went from feeling that the plaintiff would be on a path to return to work to clearly coming to the opposite conclusion was apparent to him by March of 2009, that that was not going to happen. When did the FCE, when was it completed? The FCE was completed in August, excuse me, July, July 22nd of 2014. Why so long? I represented this plaintiff years after the initial injury. And in fact, after the surgeries, I began representing him in 2014. And when I represented him, he had a functional capacity evaluation that was recommended with regard to the accident sustained in November of 2012, and he did it. And it showed restrictions, 41 pounds lifting, 77 pounds push and pull. I don't think you can apportion out which of those restrictions goes to which body parts, but none of those restrictions allow a full duty return to work to heavy duty. When I was working with the plaintiff, a functional capacity evaluation happened in 2014. I don't know why the doctors and prior counsel for this plaintiff didn't ensure that a functional capacity evaluation happened prior. But what we know is that based upon, again, a review of the work conditioning notes, the defendants expert, Dr. Kevin too, imposed permanent lifting restrictions with regard to the left shoulder. And again, it's the position of the plaintiff that those permanent lifting restrictions mean something. And the fact that the plaintiff was able to return to work in an accommodated basis, don't obviate those. And to ignore it, again, I'm repetitive at this point, but it's clear that there were objective measures of an inability to return to full duty work lifting 100 pounds and the commission disregarded it and indicated that he was earning the same wages, same title with albeit with some accommodations. And again, I'll stress that some accommodations is the vital part of the whole case. So would a functional capacity evaluation contemporaneous to the shoulder surgery been helpful? Absolutely. But in its absence, you have work conditioning notes that objectively provide similar information from which Dr. Two derived permanent lifting restrictions that in the opinion of the plaintiff, trigger the entitlement of Section 8D1 benefits, which is the preferred benefit in the workers' compensation system. And the commission ignored it in order to award a Section 8D2 award. Thank you, Mr. Kress, Mr. Jarkow, both for your arguments in this matter this morning, it will be taken under advisement and a written disposition will issue. The clerk will escort you out of the room.